The Honorable Judges of the United States Court of Appeals for the Fourth Circuit. O-8, O-8, O-8. If all persons have any evidence of form of abuse before or under the United States Court of Appeals for the Fourth Circuit are admonished, do not give their attention before the court, and I say, God save the United States and the Commonwealth. I'd like to introduce and thank Judge Gina Groh from the Northern District of West Virginia for joining us this morning and taking time away from her other day job to be a part of the court's process this morning. We appreciate your being here. Thank you. The first case is 23-4631, United States v. Garcia. Mr. Anderson. Good morning, Your Honor. I may it please the Court, my name is Howard Anderson, CJA counsel for Mr. Duran. As you know, we are here today trying to establish the standard for when a drug dog satisfies probable cause to conduct a search. Ultimately, the officer below on page 277 of the joint appendix, Officer Wright said, quote, but it's ultimately up to me and it falls onto me to say yes, the dog alerted, yes, sir. The legal issue that I'm trying to present here today is that I disagree with the officer. It is not a subjective determination. But instead, this court should hold that whether a drug dog has alerted is an objective inquiry and is a matter of law, not subjectively as a matter of fact, as the officer below thought. As you know from the briefing, we've got several sort of issues in this case. We've got the issue of standing. We have did the dog alert at all. And then if he did alert potentially, did he alert as to the bags that contained these drugs. And so I will start with the standing inquiry, if that's all right with the court. Below, the government challenged the issue of standing in their opposition brief on the grounds of abandonment. And that was the reason that the government said that there was no standing. And so that's page 35 of the joint appendix. The government's brief says that the defendant is precluded from seeking to suppress the luggage and its contents because he disclaimed the bags stored in the exterior compartment, close quote. Is that ‑‑ I mean, that seems to be true at least with respect to one of the bags, no? Well, Your Honor, there is a little bit of a ‑‑ as I read Judge Coggins's order, he seems to have found that both bags were searched prior to the disclaimer of ownership. In particular, if you look at page 624, which has his opinion, there he talks about, well, I don't need to resolve the Miranda issue. I know that you, Mr. Duran, you say that there was this interrogation, but he says that he lacks standing to challenge the search of the luggage found in the bus's exterior luggage compartment because he disclaimed the ownership in the property when asked by law enforcement to claim his bag. And so there and in the timeline he gave in his factual recitation, he seems to say that both bags were searched prior to the disclaimer. I would also note that if you look at the factual basis that the government proffered for the plea, they seem to say that the search of the bags, both bags, preceded the discussion with Mr. Duran. That doesn't seem to line up with the record evidence, though. Well, Judge, I will admit that when I go and I look at the video, I see that the officer, you know, sort of, we have the video, I think, at 737, and he's like, oh, this seems surprising to me. He's very excited that he finds the drugs in the second bag. But again, just as I read Judge Coggins's order, that's what he said. Again, I'm asking the court to vacate what he did and so we can go back and we can fix all of that if we need to. But as I understand the facts coming up here, Judge Coggins found that the search preceded the interrogation. I guess you were about to get to your point. Maybe I don't want to make the argument for you, but the government argued abandonment. Now they're arguing a different theory on appeal with respect to standing. Is that your point? I guess, Your Honor, and I'm perfectly happy to have you make my argument for me. That would be great. No, I don't get paid enough to do that. Yes. Well, because the budget has finally been approved and I'm getting paid again, I am happy to make the argument. Yes. So here, you know, even if we conclude that there was one search, then the interrogation, and then the second search, if that first search was bad, you still got an issue of fruit of the poisonous tree. Secondly, we also have a Miranda problem because if he was interrogated without his Miranda rights, I think that you are supposed to suppress the words that he uttered, and the words that he uttered are the disclaimer of ownership. And so while Miranda doesn't allow you to suppress physical evidence, Miranda does allow you to suppress the words that the client used. And without those words, the government has no basis to claim that he abandoned his interest. So, again, I think that however this results, I think we've got to send it back to Judge Coggins to do some more fact finding and some more analysis for us. Okay. You want to talk about this issue of lawful possession? Yes, Your Honor. So as I note, you know, that there is a well-settled body of property law that says that if you're in lawful possession, that's prima facie evidence that you are either an owner or a bailee. But, again, the government, as they teed the issue up for the hearing, the issue was just about abandonment. And so I don't know that the original counsel who handled the hearing, I don't know that he was on fair notice that the government was challenging that part of it. But, again, even if you sort of set that aside, you know, the government proffered evidence that he loaded the bags in Atlanta. He wasn't stealing them from somebody. He wasn't running there. And under, you know, lots of cases about property, being in possession is nine-tenths of the law. And so that creates a presumption that you are at least a bailee. And if he is at least a bailee, even if he's not the owner, he's at least a bailee, then he's got a property interest in the bags, because under the law of property, if a bailee fails to return the bailment to the bailor, he could be sued. And as we know from Jones, we now have both the CATS framework, but also this common law property interest framework that we can use. And because there is a common law claim that could be asserted, that gives him a Fourth Amendment reasonable expectation of privacy under the Jones view of the Fourth Amendment. So you do agree that, well, assuming that this sounds like you may be suggesting that the government forfeited this issue of possession by not raising it or not giving notice to the counsel below, but you concede that there's got to be some evidence in a typical case that the possession was lawful, not just naked possession is not enough? Well, Judge, if you look at those cases that I cited, it's peaceable possession is what creates the presumption that it's there. And so, again, if the video had showed him snatching the bag from somebody and running it, that would not be peaceable possession. But the video that the officers talked about showed him in peaceable possession of the item. And so that is what creates the prima facie evidence of at least a bailment. And is that Anderson on bailment or is there a case that supports that? Judge, I have cited the cases. Admittedly, they are kind of old. Right. So I think and I don't remember the names off the top of my head. I get them for you for the rebuttal. But those are the ones that like 1923 out of the state of Washington, there was one from 18 something out of the state of Illinois. Some of the greatest hits are coming up. Judge, you know, as we like to say, well-settled authority. Right. That's been it's been the law for more than a century or maybe even two sometimes. But, yes, that is the the property interest. But again, just because we've got these factual issues, you know, what I'm asking is not for the court to necessarily say that the suppression should have been granted. Although, of course, I'm happy if you do say it. But, you know, if if we need to have more testimony on that, we can go back. But again, I just don't know that it was put on fair notice for trial counsel before you got about five minutes. I think maybe that the better use of your time would be to talk about what you opened with. And that is this issue of subjective versus objective evidence of the dog alerting. Yes, Your Honor. And so I I certainly hope that we get there with respect to overcoming the standing issue. But as you know, there's not there's not any binding precedent from this court that that settles the question. We have several district court cases, including in particular the case from Judge Ridinger, which I think is very persuasive. That's the Wilson case there. And there, what he said is, you know, look, if if we let it be just a subjective standard, then there's no way that a court can ever review what the officer did. And the whole point of the Fourth Amendment is that is that there's supposed to be some barrier between the officer and people's expectation of privacy. And so what we need is some subjective, some objective sort of manifestation. There, Judge Ridinger said, it doesn't even give you reasonable suspicion if the if the dog doesn't do what he's supposed to do. And there in in Wilson, the dog was trained to sit, but he did not. The agent said that he lowered his head. He changed his gait. There were changes in breathing. Judge Ridinger said that doesn't even give you reasonable suspicion to continue it. I'm not asking the court to go that far. What I am asking is, is the court to say, look, this this dog has been trained. He's been sent to school. He's been validated in all these hundreds of tests that he has to do that when there are drugs, he sits. Here, everybody agrees he did not sit. So. So all there was other signaling behavior at that full hearing that the that the parties had before the district judge. Correct. And that was explained through the testimony of the officer of the officer and through the testimony of the officer with regard to the dog certification and qualifications. What the officer said, you know, well, you know, there was this sort of changing in breathing. And so based on the officer's experience, he said, you know, well, I think it was I think it was an alert experience with that dog. Right. But but that experience was not validated through the hundreds of tests, et cetera, et cetera. Right. So we don't. And so that's the problem. So when you look at the video, you know, I don't know that I see the same things that the officers do. And my whole point is that there needs to be the same standard as the magistrate judge were there on the scene. And when the magistrate judge sees what the dog did, knowing that the dog has been trained to sit when he finds drugs and he sees the dog did not sit with the magistrate judge on the scene, say, yes, I'm going to sign a warrant right now. Or is the magistrate judge going to say, well, maybe there's enough to investigate further. So let's maybe pull out the bags and let's have him sort of test again, because it's just not clear. Particularly if you look at the beginning of the video, the dog is very distracted because of all the cars that are flying by. And again, I just don't think that a magistrate judge on the scene having seen all the stuff in the video, knowing that the dog has been trained that when this happens, you're supposed to sit. He didn't sit. I don't think the magistrate judge should have approved the warrant. And if a magistrate judge wouldn't have done it, the officer on the scene should not have said that I'm going to search anyway. Wasn't there evidence in the record that the dog it's true. His principal alert mechanism was the sit. But there was also and correct me if I'm wrong, evidence in the record that he had alerted in different ways and somewhat consistent with what he did in this case. There was some testimony to that effect, judge. But how do we know that, you know, the, you know, for in some of the cases, the breathing pattern was 60 breaths a minute as opposed to 30 breaths a minute. Right. So that's the problem is that we really have more than breathing, though. I think it was sort of the lowering of the haunches. Apparently, chaos is a bit dainty. Didn't want to sit in the mud. Said as much. The trainer said, you're not going to sit for me. Isn't that right? Well, kind of expected that that was what was going to happen. Consistent with what apparently happened in the past in instances where he had credibly alerted. Well, judge, you know, again, as I say, you know, it's sort of heads I win, tails you lose. Right. So you're not going to sit for me. Therefore, you're alerting. You are sitting for me and you're alerting. And the Fourth Amendment, I think, demands more than that. That what we need are these objective signs that you can explain to a magistrate judge on the scene, and the magistrate judge will say, yes, I agree, he is alerting here. Again, my point is that there was reasonable suspicion, and so we can investigate further. I'm not asking you to go as far as Judge Reidinger did, but I don't think that a reasonably prudent person in the face of a dog who has been exceptionally well trained to sit in the face of drugs, he did not sit. I don't think a reasonably prudent person would have rifled through all those people's bags at the bottom of the bus. And with that, Judge, I will turn it over to the government and be happy to come back and answer any questions in a few moments. Thank you very much. Thank you, Your Honor. Good morning, Mr. Garner. Good morning. May it please the court, Ben Garner on behalf of the United States. This court should affirm Mr. Garcia's convictions because the district court did not err in determining that Mr. Garcia failed to satisfy his burden in establishing Fourth Amendment standing, second, that he abandoned any interest in the second suitcase that was searched, and third, that probable cause existed to search the luggage based upon the dog alert to narcotics. I will start where my opposing counsel left off, and that is on the merits, unless the court directs me otherwise or has any questions at this point. Mr. Garcia's argument that because K-9 Chaos did not react with a formal alert by sitting, that his alerts did not provide probable cause as a matter of law to search the luggage, is flatly inconsistent with Supreme Court precedent and the standard embraced by the Supreme Court in Florida v. Harris. There, the Supreme Court squarely rejected the approach of a, quote, strict evidentiary checklist to assess a dog detection reliability and instead indicated that evidence of a dog's satisfactory in a certification or training program can itself provide sufficient reason to trust his alert. So that means that if the dog did well at the academy, it doesn't make any difference how they alert or not alert in the field. That's the way you read that Supreme Court case because that's what it sounded like what you just read. You're saying as long as he got a passing grade and did well in school, when you come out in the real world, whatever he does is fine. That's basically what you just said. Well, Judge Gregory, that is one factor for the court to consider as articulated by the Supreme Court. Here we have more than just the training and the certification of K-9 Chaos. We also have the testimony of Officer Wright. The court also indicated that the credibility of the handler is also important for the district court's analysis. And so here we had evidence that the district court found that K-9 Chaos' satisfactory performance during certification and having as well as the handler's credible testimony sufficient to establish K-9 Chaos' reliability. So it wasn't just the certification and the education and training of K-9 Chaos. It was also the testimony of Officer Wright that the court evaluated and was there to assess firsthand his credibility. The district court specifically based its findings of reliability on the fact that the records documenting Chaos' certification to detect narcotics, including marijuana, cocaine, heroin, and methamphetamine, the fact that he was certified by a nationally recognized association and organization. That seems to go, again, to the training and the fact that he did well in the academy. He apparently had a perfect record, it sounds like. But the concern is, notwithstanding that, if the defendant is being told or the record evidence is that this K-9 alerts when he sits, that's his alert signal and he doesn't do it in this particular instance, how is a trial court supposed to gauge that? I mean, at that point, it's entirely in the hands of the handler, isn't it, as Mr. Anderson says? I don't think so. I mean, the certification and the training is objective criteria that the court can rely upon to make its determination. Right, but part of the training is the dog alerts when he sits. Well, Judge Gregory, or excuse me, Judge Diaz, the… I'll take that. The fact that sitting was K-9 CAOS's final response or final alert very well may be the gold standard for K-9 CAOS, but the Supreme Court and this court has recognized that in Fourth Amendment principles, there is a commonsensical and elastic standard that is applied. And in this case, it wasn't just the training. And while the sit may be the gold standard, I would submit that it's not the only standard that a district court can rely upon. Here, we have the testimony of Officer Wright that, notwithstanding the initial certification, there was ongoing certification that he conducted with K-9 CAOS. He testified in front of the district court that although the sitting may be a final response or a final alert by K-9 CAOS, that there were other alerts that he would give. And that was based upon the direct observation of Officer Wright through the initial training as well as the ongoing training. In this specific case, he cited the fact that K-9 CAOS, that his walking speed slowed, his tail pattern changed, breathing pattern changed, and began walking with his mouth closed. And the district court wasn't left with just relying upon Officer Wright's testimony. The district court also had the benefit of the body camera. And the record reflects that throughout the suppression hearing, Officer Wright frequently directed the government counsel to replay the body camera. And so he could see and point out for the court specifically where K-9 CAOS was alerting. But the dog walked by first, didn't alert at all, right? Didn't it pass by the cargo hold and didn't alert at all? And Officer Wright provided context and testimony as to that point. The fact that this traffic stop took place on the side of a busy interstate, he testified that weather conditions can certainly have an impact and the dog's ability to conduct a final alert. More reason to be unreliable. Not when taking into context the experience and training of the officer. Magistrate judges every single day rely upon the training and experience of case agents when approving affidavits. And that is the same testimony that was offered to the district court in this case, was the certifications, the experience of Officer Wright. See, the problem, counsel, is this. I understand what you're saying, but the problem is in terms of guarding the Fourth Amendment right in the Constitution is when an officer says he or she says something, we can question them and credibility and that kind of thing. But you can't cross-examine a dog. The dog is reliable solely because he or she reacts consistently in a constant way. And in the record, you put in that the dog alerts by sitting down. He did not sit down. That's undisputed. Now you're trying to put elasticity in the situation by saying, yeah, but it doesn't have to be. There could be more. We can't cross-examine a dog. Dogs, animals are normally trained. They're not, they don't learn, they train. And when you train someone, you say, listen, when I say sick, you bite. When you smell marijuana, you sit down. And when I say come here, you come here. That's how they're trained. They don't learn, they train. They're trained when they smell it, sit down. They did not. Now you're saying this court should say, well, you don't always have to sit down. The breathing pattern was like, you know what I'm saying? It puts so much distance in terms of protecting the constitutional right that it makes it very difficult. Because what you just argued could be argued by anyone, anyone. The dog didn't feel well. There was a ham sandwich in the cargo. And we don't know what it is because why would the dog not sit down? Can you answer that question? I don't need to because Officer Wright did. Officer Wright testified that his belief that. His belief, you just said. Correct. He also testified, Judge Browery, about the months on end that he spent bonding with K-9 KFs and the importance of that in terms of the training and the experience as well as. . . More reason that the dog should respond consistently. Well, Judge Browery, this court has certainly recognized the fact that the testimony of the K-9 handler is absolutely critical to. . . We don't question that. Well, if the court agrees that the testimony and the credibility of the K-9 handler is important, then it should credit, just as the district court did in this case, the testimony of Officer Wright insofar as his explanations as to why a final alert hadn't taken place. As I indicated, a final alert may be the gold standard, but it's not the only standard. In the fact that the district court judge had the training, the documentation, the fact that the district court was in a position to evaluate the body camera coupled with Officer Wright's testimony before the court gave the court ample objective evidence to predicate its determination of reliability on. . . in this case, a bright-line rule. There's the Eleventh Circuit's case in United States v. Brady where the Eleventh Circuit, the panel of the Eleventh Circuit, affirmed the district court's determination, rejecting the testimony of the precise expert that testified, defense expert that testified in this trial, or excuse me, in this hearing, and instead crediting the testimony of the K-9 handler. And I would note, too, that in that case, the K-9 had not conducted a final alert. There was other observations that the K-9 officers testified about to support the reliability in that case. How many indicia of signals by the K-9 is sufficient? I mean, is there a mechanical test, or do we have to just take it on gospel that when a trainer says that the dog has done A, B, C, and D, that that's sufficient and we don't need to question that? Judge Giaz, I'm certainly not advocating for any mechanical test, and I'm not aware of any court that has embraced one. I think it is up to the district court to assess the credibility of the handler and the testimony. This is not a scenario that Judge Gregory was referring to in terms of a handler coming in and just opining that, you know, I had a sixth sense that my K-9 was alerting to the presence of narcotics. Instead, he had very specific behaviors and actions that K-9 Chaos exhibited that he pointed to and relied upon in support of his determination. And so, Judge Giaz, to answer your question, there's not a specific number that the government would point to, but there does need to be some objective indicia to support the determination of the handler. And in this case, the district court was satisfied that there was, coupled with the credibility determination that the district court made in terms of crediting the testimony of Officer Wright and rejecting or at least discounting the testimony of the defense expert. So with respect to the, you know, this issue of the dog alerting when he's sitting, he's trained to do that, right? You can see that that's what the traditional alert is, at least. He's trained for that to be the final alert.  Yes. Okay. So what did he do? This wasn't a final alert? Is that what you're saying, the Chaos in this case? That's correct. That's correct, Your Honor. And as I indicated, Officer Wright testified that based upon his training, his experience with specifically K-9 Chaos, that that was not the only behavior that Chaos would exhibit when he detected the presence of narcotics. And there was also testimony, and what he's basing this off of is prior traffic stops as well as training and experience in controlled settings. So this isn't just Officer Wright stating it and the district court left to accept the testimony as gospel. He's got specific instances that he is pointing to to support his belief in his statement that there is other observations or other conduct that K-9 Chaos may exhibit, which would lead the handler to believe that the presence of narcotics are present. That he had exhibited in the past. Correct. Support and alert. Correct. Those were all training exercises or were they actual stops? Officer Wright testified as to both, that there were controlled training exercises as well as other stops. And as I also indicated, this was not just one alert short of a final alert. Officer Wright pointed to numerous conduct that he observed from the K-9 and it was supported by the body camera footage that was displayed at the suppression area. Do you agree with the holding, the final result in the Wilson case, Judge Ridinger's opinion in that case? Do you think that that was wrong as a matter of law or do you think that the facts were just different there? Your Honor, in terms of the Wilson case, I will hedge my answer insofar as these analysis are so fact-bound in terms of a determination as to whether a dog has reliably alerted to the presence of narcotics. I think it really depends upon the objective evidence that is presented to the court. What the government is rejecting is any sort of bright-line rule. And it's the rule that Mr. Garcia is advocating for in this case is that there be a bright-line rule that anything short of a final alert that the dog is trained and certified for would be insufficient for a district court to rely upon. I think that that does not find any support in Supreme Court case law, particularly Florida v. Harris where the court invalidated the test embraced by the state of Florida. As I indicated as I began my argument, there the court rejected any bright-line rigid test and instead that just like in other Fourth Amendment settings that there's an elastic, commonsensical approach that district courts are to take. I know you said you wanted to hedge, but I'm going to push back a little bit. Do you think that the holding in Wilson was a bright-line rule that we should reject? Or do you think Wilson is on its face different factually that it doesn't apply in this case? My reading of Wilson and the other district court cases that were cited by Mr. Garcia is that it embraces a bright-line rule that the government objects to and would ask this court to reject. Can I ask you a question? You want to talk a little bit about standing and this issue of possession because it sounds like this is a theory that was presented for the first time on appeal. Maybe it doesn't matter. Tell me why you think we don't even get the probable cause because the defendant lacks standing. Sure, Judge Diaz. This court has made absolutely clear to litigants who wish to challenge either an item, excuse me, the search of either an item or an area that the burden is on the defendant to establish Fourth Amendment standing and that the burden is on them to do so they must demonstrate a legitimate expectation of privacy. Here the government below challenged Mr. Garcia's Fourth Amendment standing and notwithstanding that for the first time on appeal Mr. Garcia is advancing this theory of a bailment interest in the suitcases that were located on, excuse me, in the luggage compartment of the bus. Your Honor. But I understood Mr. Anderson's argument to be that what the government was focusing on below was abandonment, not necessarily that there was unlawful possession from the get-go. Well, the government certainly on page 34 of the joint appendix put the defendant on notice that it did not believe that Mr. Garcia had the requisite possessory interest or privacy interest and it specifically cited Jones v. United States where, and that's a case where the Supreme Court characterized the defendant's possessory interest as that of a bailee. And so in that the government was clearly indicating to Mr. Garcia that it did not believe based upon the context and the specific facts of this case that it was apparent that he had the requisite possessory or privacy interest to pursue the Fourth Amendment challenge. So a defendant in physical possession of property like it's clear on this video that he was, Mr. Anderson's argument that possession is nine-tenths of the law with respect to lawful possession, that's not correct? No, it's not. And the Supreme Court as well as this court have made clear that possession alone is insufficient to establish Fourth Amendment standings. To the contrary, an individual must show not only possession of the item but that there's a legitimate or lawful expectation of privacy. And the Supreme Court has distinguished over the years the requisite showing depending upon the status of ownership. The Supreme Court has said that a full, that the burden is less on an individual that is a owner who is legitimately in possession of the place or item that is being searched. However, someone that is a bailee or a non-owner must demonstrate a lawful or legitimate possessory right. This court's case law, excuse me, this court's case in United States versus Daniels establishes that fact there. The defendant was clearly in the possession of a vehicle. However, he put no evidence in the record that he was in lawful or legitimate expectation or possession of the car. In that case, he was operating a rental vehicle that had been rented to his girlfriend. The fact that he put no evidence in the record supporting the fact of his lawful or legitimate possession, this court found that he did not have Fourth Amendment standing. And that's the same standard that the government asked below in contesting the requisite possessory interest and asked this court now to hold or to affirm the district court's conclusion that he did not have or did not demonstrate the possessory, the requisite possessory interest. And he would have to give up a Fifth Amendment right to do that? No, Your Honor. The Supreme Court has held that a defendant who testifies during the course of a suppression hearing, that the government is not permitted to use those statements against him towards the issue of guilt at trial. This court in United States versus Daniels specifically held that in faulting Mr. Daniels, Daniels for not putting up any evidence, said that he clearly could have testified but elected not to. You know, in addition to testimony from the defendant in United States versus Castellanos, the court pointed to other evidence that a defendant can introduce to demonstrate a possessory interest there. The court said that the defendant's failure to present evidence that anyone granted him permission to use the property subject to the search or to act as the owner's agent meant he failed to demonstrate a requisite possessory interest to the property. And so the government is not asking this court to hold that a defendant has to testify. There's other ways that he or she can prove the requisite possessory interest. But what this court has said and made absolutely clear is that the burden is on the defendant to show not only possession but also legitimate or lawful possession, and that was not done in this case. Thank you very much. Thank you, Your Honor. Thank you. May it please the court. To be clear, I'm not advocating for a bright line rule that says that a dog has to sit before any search can take place. What I am saying is that there needs to be objective criteria for a court to evaluate it. And so if we had, for example, this change in breathing patterns plus some nervous behavior on the part of Mr. Duran or some information from a confidential informant that maybe there are drugs there, those objective facts we could draw a constellation and then maybe say probable cause exists. But on this record, all that we have is that the dog is well-trained to do one behavior. He did not do that behavior, and the government says that that is enough for a reasonably prudent person to go rifling through a whole bunch of other people's luggage. And I think that the Fourth Amendment is a gold standard. That's what our framers wanted, right? So if you want the silver standard, that is reasonable suspicion where you can investigate a little bit more. And I agree that the government did have reasonable suspicion, right? So yes, the officer said, well, maybe this dog, maybe he's trying to sit, but I don't know if he's really doing it. And so fine, take some time and do more investigation. I am not trying to cut law enforcement off at the knees. But what I am saying is that if you're going to say that what we have here was enough to get a warrant, if a judge had been on the scene and seen everything that that officer saw, I don't think that a judge would have signed that warrant. Because we've got, well, he was breathing heavy, right? But for the training, we have sort of objective criteria to know when he passed his training or not. And so in the other times where the dog has breathed heavily, right, how many breaths per minute was it? Because we need to be able to compare this behavior to other behavior. And basically the officer is just saying, judge, you've got to take my word for it, that I thought he was breathing funny. And to me, because I can read minds and I can read a dog's mind, that that was what was going on. Can I ask you about the Parada case, the 10th Circuit case? Yes, Your Honor. Do you disagree with the holding in that case? Do you think it's factually distinguishable? We should reject it. What's your view of that? Judge, again, my position is that you don't have to have a final alert all the time, right? It's just a question of we need objective criteria. And so if you don't have... Objective criteria beyond the dog's behavior is what you seem to be saying. Well, I mean, so the fact that we had a half alert here, right, I mean, maybe that's something. And that plus some, you know, hey, I see this guy over here, he's acting nervous. Or, hey, I asked everybody to claim their luggage and nobody got this. Gee, that seems funny, right? Those things where we could take it to a judge and then we could talk about as a matter of law, would a reasonably prudent person proceed on that basis, yes or no? That actually did happen in this case, but the timing, the sequence was off. And that's exactly the problem here, Judge, right? And so what I'm saying that they should have done is either pull the bags off and line them up on the road and let's have the dog walk and see if he does what he's supposed to do, or if you don't want to do that for whatever reason, go and talk to the folks and see if you get, you know, further evidence that might cause a reasonably prudent person to go and rifle through other people's luggage. But, you know, but before somebody goes and pulls out my underwear from my suitcase, I hope that the officer has got some objectively verifiable information because I've got a privacy interest in my luggage, even if I'm on a bus. And so, again, my point is that I'm not saying that the officers couldn't proceed with the investigation. It's just that they didn't. They skipped a step and they went right to rifling through the luggage, and that is what I say is the problem here, that yes, there was reasonable suspicion. They can investigate further, but they did not have the right to go and open up everybody's luggage on this record. And then as for the standing issue, again, I think that we need to send this case back to Judge Coggins to sort of reevaluate some of the law under the right standard. My point is that I just don't think that original counsel was on fair notice, given the statement in the government's heading on standing where it says, the reason we say he doesn't have standing is because he disclaimed it. I just don't know that the trial counsel was on fair notice that that was really going to be the contested issue, that even if he hadn't disclaimed it, there is no standing, because that's the government's position here. I don't know if the trial counsel was on fair notice about that. And as I say here, of course, you've also got plain error because, you know, we were going to admit this evidence at trial. But again, I think we could resolve the bailment issue by just sending it back to Judge Coggins to ask him to sort of open up the record. And if you find there was a bailment, there is standing. If you find there is no bailment, then there is no standing. And that would be how I would propose to resolve that issue. If the Court has no further questions? Thank you very much, Mr. Anderson. All right. I thank Your Honor. I want to thank both counsel for their fine arguments in this case. Mr. Anderson, as we went back and forth earlier this morning, you are court appointed, and we're obviously very grateful to you for taking on this case, even in the face of challenges with respect to payment. I think if our appropriators had been in this courtroom today, they would have realized the bang that they're getting for their buck when it comes to court-appointed work. You did a wonderful job. Representing your client in this case, and Mr. Garnett, you did the same in representing the interests of the United States. We'll come down and greet you both and move on to our second case.
judges: Albert Diaz, Roger L. Gregory, Gina M. Groh